UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                        Case No. 21-CR-10354-WGY - 5

ERIC CORREIA

**DEFENDANT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE OR VARIANCE**

Defendant Eric Correia comes before the Court for sentencing following his guilty plea in this 22-defendant RICO case.  Mr. Correia pleaded guilty to one count of Conspiracy to Participate in a Racketeering Enterprise, and one count of Distributions of and Possession with Intent to Distribute Marijuana.

He hereby submits this sentencing memorandum in support of his request for a sentence of 120 months incarceration, followed by 3 years of supervised release. He further requests that he be assigned to a Residential Drug Abuse Treatment ("RDAP") program in the Bureau of Prisons.  The sentence requested is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  As set forth below, the seriousness of Mr. Correia's offense is substantially mitigated by his mental health and addiction history, his extraordinary rehabilitation, the unusually strong support from his family, his tragic and traumatic experiences, his youthfulness, and need for drug and mental health treatment.  This memorandum will submit reasons why this Court should grant a sentence that is below the advisory Guideline level and is appropriate in light of the relevant factors enumerated in 18 U.S.C. § 3553 and the advisory sentencing guidelines.

1

**Introduction**

Eric Correia is a 26-year-old man with two young daughters and a close-knit and supportive family who is facing a Guideline sentence that, when run through § 3553 sentencing factors, is disproportionate to what is appropriate. The courts long for success stories and for defendants who can turn their lives around.  Mr. Correia is just such a man.  He respectfully requests that this Court allow for him and his family to continue to climb and to prosper, and to allow for his family to realistically dream of a better life.

Eric fully accepts responsibility for crimes he has committed, and for all the consequences that followed, including his loss of freedom.  He has now been detained on this case since April 19, 2022.  He has enrolled in the inmate-sponsored restorative justice program at Wyatt ("B.O.S.S."), and is prescribed an anti-anxiety medication (PSR ¶ 69).  The defendant's proposed sentence would provide him with the best chance to continue to confront his mental health and addiction issues, and lead a law-abiding life.

The Court should impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing, by considering the factors enumerated in 18 U.S.C. § 3553(a).  In the advisory guidelines regime, it is now well established that the guidelines serve only as a starting point in the Court's analysis, and should not be presumed to yield the appropriate sentence in any given case.  *See Nelson v. United States*, 555 U.S. 35, 351 (2009); *Gall v. United States*, 552 U.S. 38, 49 (2007).

**I.   The History and Characteristics of the Defendant**

As this Court can see from the many thoughtful and sincere letters filed with this sentencing recommendation (Ex. 1), Eric Correia has a strong, supportive, and close-knit family.  He was living what he describes as a "fantastic" childhood with

his large Cape Verdean-American family in Boston, but it all came crashing down in 2014, when his brother, Jeffrey Goncalves, committed suicide.  Eric, who was 16-years old at the time, spiraled into untreated mental health problems and self-medication with street drugs and alcohol.  He began skipping school, dropped out of basketball, and sought refuge with friends, many of whom were members of the Cameron Street gang.

Mr. Correia has been diagnosed with adjustment disorder with mixed anxiety and depressed mood, with general anxiety disorder, post-traumatic stress disorder ("PTSD") and major depression disorder.  PSR ¶ 69. His brother, who had been committed to a mental health facility prior to his suicide, was diagnosed with schizophrenia.  His sister, Carla, believes that their mother has undiagnosed bipolar disorder.

In an attempt to help, Eric's mother sent him to live with family in Cape Verde, but there he witnessed a friend get hit by a car and run over by a bus, resulting in death. After this, he moved back to Massachusetts, where he lost more than ten friends to gun violence and drugs.  In 2021, with the approval of the state court,[1] the family made the decision to remove Eric from the Dorchester neighborhood where he was involved with criminal activity, and purchased a home and moved to Florida.  Sadly, his father passed away unexpectedly in late 2021 from organ failure.

Unfortunately, by the time he had relocated to Florida, Eric had already committed the crimes that brings him before this Court.  Although he was doing well in Florida and saw that he could live a better life, he still had to take responsibility for his past actions.  Nonetheless, this Court should note that, even before his

---

[1] Mr. Correia was released on bail in state court at the time.

federal arrest, with the help of his family he had begun to turn his life around.

After his federal arrest, and since his confinement at Wyatt, Eric has made tremendous strides in acknowledging the harm he has done, and seeing what his future holds for him, his family, and his community, by making the difficult changes that are before him. As this Court is no doubt aware, the Probation Department has created a Restorative Justice ("RJ") program.[2] Restorative justice, broadly, works to rehabilitate those who commit crimes and address the harm they have done by working with victims and survivors to find ways to hold criminals accountable other than incarceration.  Unfortunately, due to budget constraints, the Probation Department was unable to continue with the pilot RJ program at Wyatt.  Several detainees who had participated in the RJ program at Wyatt before it was discontinued started their own, detainee-run program, called Building on Self-Substance (B.O.S.S.) (see attached letter, Ex. 2).  Mr. Correia is a member of the B.O.S.S. group at Wyatt and has found it life-changing.  His eyes have been opened, and he understands he cannot minimize his role in what he has done that has hurt real people.

Mr. Correia took illegal actions because, unfortunately, he was overwhelmed by his situation and didn't see a way out.  He took actions and made choices that he now realizes harmed not only others, but himself as well.  In retrospect, he would not make the decisions, and would give anything to go back in time and undo his actions.  Of course, he cannot do that, and he must live with the consequences. Mr. Correia can best explain in his own words how he has changed. (See attached

---

[2] *See* Hon. Peter B. Krupp and Hon. Michelle D. Fentress, Restorative Justice:  An Opportunity for the Courts, 68 Boston Bar J. (Summer 2024); available at: https://bostonbar.org/journal/restorative-justice-an-opportunity-for-the-courts/

allocution statement, Ex. 3).[3]

The courts and the law seek to impose a moral structure that ideally makes for a "better" functioning society.  Unfortunately, actual existence introduces moral ambiguities that are not so readily categorized.  Living in this real world is disorienting, and at any early age introduces the reality that what is moral and just is contingent, vague and fluctuating.

The reality for Eric Correia and so many defendants is that they must adapt to comprehend and survive.  When one looks at his history, one can see that he was influenced by the neighborhood he grew up in.  He was exposed to crime and violence at a young age, and after his brother's suicide he was simply unable to cope.

Trauma can impact development and contribute to an adolescent's impulsivity.  Nim Tottenham & Adriana Galván, *Stress and the Adolescent Brain: Amygdala Prefrontal Cortex Circuitry and Ventral Striatum as Developmental Targets*, 70 Neuroscience & Biobehavioral Rev. 217 (216).  A young person, such as Eric, is often less equipped to identify or manage their trauma without support.

Eric Correia was in his early 20's at the time of the charged offenses.  As discussed more fully below, his status as a late adolescent affected his decision-making and the influence of his peers.  As can be seen by his allocution statement (Ex. 3), he has already begun to show signs of maturity, realizing his poor decision-making and desire to change.

---

[3] The allocution statement was scanned and sent from Wyatt Legal Mail, and some of it is illegible.  A typed version as well as the hand-written copy are both included in the exhibit.

## II. The Nature and Circumstances of the Offense

### A. Attempted Murder of Victim No. 14:  RICO Overt Act 10bb

Eric Correia accepts responsibility for his role the shooting of Victim No. 14 that occurred around 11:41 a.m. on March 21, 2019 in Dorchester.[4]

The victim, a member of the Wendover NOB gang, was in a car in front of 39 Claybourne Street.  Mr. Correia, who was on GPS monitoring as a condition of release from a state court case, saw Victim No. 14 on Claybourne Street, and called other Cameron Street members to tell them. Correia knew that he would be identified from the GPS monitoring, and did not participate in the actual shooting. Co-defendant Clayton Rodrigues is also charged with attempted murder in this overt act, and is apparently the person who shot the victim (see PSR ¶ 28).[5]  The victim of the March 21 shooting was taken to Boston Medical Center, where he was treated for a collapsed lung and other injuries.

The Wendover Street/NOB and Cameron Street are two Cape Verdean gangs that have been rivals for years.  Mr. Correia does not begrudge the government for trying to stem the violence in his community, and hopes for a better future for his family and community.  A review of his allocution statement (Ex. 3), shows that Mr. Correia repents his role in contributing to the serious violence in his community, and hopes to make a positive difference in the future.  He understands that he must be punished for his actions, but he is also hopeful that this Court can see he is a better man and that he can contribute to society if given a chance.

---

[4] No state charges were brought against Mr. Correia for this case.
[5] Upon information and belief, Clayton Rodrigues is currently a fugitive.

### B.  Robbery of Victim No. 6:  RICO Overt Act 1e

Eric Correia accepts responsibility for the robbery of Victim No. 6 on July 20, 2019.

Around 8:09 p.m. July 20, 2019, Mr. Correia participated in the robbery of Victim No. 6 on Downer Avenue, near Cameron Street.  Victim No. 6 had arranged to buy marijuana from Correia.  When the victim arrived at the designated location, Correia got into the back seat of his car, put a small gun to his head, pulled the keys out of the ignition, and demanded money.  Correia took the $450 that Victim No. 6 had brought to buy marijuana, and fled.  According to the victim, Cameron Street member Walter Batista[6] stood outside the passenger door of the vehicle, made a gesture toward his waist and made mention of a firearm and not to move to a passenger in the vehicle.  The victim knew both Correia and Batista.  Correia was detained shortly thereafter, was arrested and charged in state court.[7]

### C.  Possession with intent to distribute marijuana on March 9, 2022:  RICO Overt Act 10y and Count 37

Eric Correia accepts responsibility for selling 311 grams of marijuana on March 9, 2022 in a controlled buy.

On March 8, 2022, and confidential witness, CW-1, contacted Correia by phone and arranged to purchase one quarter pound of marijuana for $1,400.  The following day CW-1, equipped with an audio-video recording device, drove to Saxon Street in Boston, and Correia entered CW-1's car.  Correia informed CW-1 that he was waiting for a third party to come and unlock the door to a stash house at 20

---

[6] Batista was not indicted in federal court.  He is charged in Suffolk Superior Court, docket no. 1984CR000564, and is currently in default / warrant status.

[7] *Commonwealth v. Eric Correia*, Suffolk Superior Court docket number 1984CR00565; (PSR ¶ 55).  The state case was *nolle prossed* after he pled guilty in the case at bar.

Saxon Street.  An unidentified female arrived, opened the stash house, Correia went inside the house and returned to CW-1 car carrying a bag.  Correia handed CW-1 the bag, which contained 29 packages of a green substance, and CW-1 gave Correia $1,400.  Testing confirmed that the bag contained 311 grams of marijuana.

### D. Attempted Murder of C.V.:  RICO Overt Act 10b

Correia acknowledges that he was charged in federal and state court with the attempted murder of C.V. on October 2, 2017.[8]  As noted in his PSR objections, Mr. Correia did not plead guilty to this act.  (Defendant's PSR Obj. ## 3, 6-8).  Because the PSR finds him accountable, the facts as laid out in the PSR are listed here.

On October 2, 2017, Boston police officers responded to a report of shots fired on Harlow Street in Roxbury.  The officers met with the victim, C.V., who stated that a black Acura had pulled up next to him and shot one round at his passenger side winder, missing C.V.  By reviewing surveillance videos, detectives were able to identify the Acura, which was reported as being stolen two days earlier.  Surveillance further showed the driver proceeding down Cunningham Street, the driver exiting the vehicle and running toward 75 Wayland Street.  Officers met with the homeowner, who stated that her nephew, "Bubba," and his friend had gone to her apartment on the second floor through the rea porch, said hello, and quickly exited the apartment through the front door.  Law enforcement identified Correia as the passenger in the Acura and Arlindo Lopes as the driver.[9]  PSR ¶ 23.  The state case against Correia was *nolle prossed* on September 19, 2024, with the

---

[8] *Commonwealth v. Eric Correia*, Suffolk Superior Court docket number 1884CR00142; (PSR ¶ 40).

[9] Arlindo Lopes was charged in state court, *Commonwealth v. Arlindo Lopes,* Suffolk Superior Court docket number 1884CR00143.  On December 28, 2022, he pled guilty to attempted assault and battery by discharging a firearm (count 4), and carrying a loaded firearm (count 7).  He was sentenced to 2 years and 6 months in the house of correction.

Commonwealth indicating it did not believe that it would be able to sustain its burden of proof.

### E. The Guidelines Calculation

On April 29, 2024, pursuant to a written plea agreement (ECF No. 726), Eric Correia entered a plea of guilty to Counts 2 and 37 of the Third Superseding Indictment, which charges Conspiracy to Conduct Enterprise Affairs through a Pattern of Racketeering Activity, in violation of 18 U.S.C. § 1962(d) (Count 2), and Distribution of and Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 37).  As part of the plea, the defendant and Government have agreed that Correia committed the offenses charged in Count Two that involved:  (1) an attempted murder of Victim No. 14 on March 21, 2019, where the victim sustained life-threatening injuries (ECF No. 403, Indictment ¶ 10bb); (2) a robbery of Victim No. 6 on July 20, 2019 (Indictment ¶ 1e); and (3) possession with intent to distribute marijuana on March 9, 2022 (Indictment ¶ 10y)

The PSR maintains that Correia should also be held responsible for the attempted murder of Victim C.V. on October 2, 2017 (PSR ¶ 40; Indictment ¶ 10b).  According to this version of the offense, Correia's Total Offense Level is 36.  With two criminal history points and a criminal history category of II, the advisory Guidelines range is 210 to 262 months.  If he is not held responsible for this crime, the Total Offense Level is 34, and the advisory Guidelines range is 168 to 210 months.  The 2-level increase in the offense level in the PSR is due to the Multiple Count Adjustment under USSG § 3D1.4.  (PSR ¶40; Defendant's Obj. ## 3, 6-8)

Correia acknowledges that he was charged in federal and state court with the attempted murder of C.V.  He was held in state custody on the case from October 23, 2017 to March 26, 2018, a total of 155 days (PSR ¶53).  However, the

Commonwealth filed a *nolle prosequi* on September 19, 2024, which states that the Commonwealth "does not believe that it will be able to sustain its burden of proof" for the charges.[10]   As noted in his PSR objections, Mr. Correia did not plead guilty to this act.   (Defendant's PSR Obj. ## 3, 6-8).  Without the finding of accountability for this act, however, it is not clear that the Bureau of Prisons will credit Mr. Correia for the 155 days spent in state custody.

Whichever Total Offense Level this Court determines applies to Mr. Correia, the Government has agreed to recommend a sentence of 192 months (ECF No. 726, ¶ 4(a)), and the defense recommends a sentence of 120 months.

### III. The Purposes of Sentencing and the Kinds of Sentences Available

Sentencing pursuant to 18 U.S.C. § 3553(a) calls for a holistic approach.  *See generally United States v. Martin*, 520 F.3d 87 (1st Cir. 2008). The Court should ultimately arrive at an appropriate sentence after a consideration of deterrence (both specific and general), public protection, just punishment, and rehabilitation. As far as deterrence is considered, both specific and general, a man has been arrested and convicted of a federal felony.  Under the sentence proposed by the defense, he will be incarcerated for 10 years, and under federal probation supervision for 3 years.  This is a substantial sentence that will deter Mr. Correia and other from engaging in similar conduct.

As set forth below, the seriousness of Mr. Correia's offense is substantially mitigated by his demonstrated remorse and desire for change, his extraordinary rehabilitation, his history of trauma and mental health issues, and his strong family support.  There is no need to sentence him beyond the significant sentence of 10 years requested by the defense to prevent him from committing further crimes,

---

[10] The *Nolle Prosequi* is attached as Ex. 4).

given his demonstrated desire and ability to become a positive, adult member of

society.  A sentence of 10 years is the only humane sentence under the particular

circumstances of this case.

It should also be recognized that it is the certainty and swiftness of

punishment that can have a substantial deterrent effect, more than the sentence's

severity.  Research has consistently shown that while the certainty of being caught

and punished has a deterrent effect, "increases in severity of punishments do not

yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and

Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of

Science panels … reached that conclusion, as has every major survey of the

evidence."  *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice

Paradigm:  Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol.

421, 447-448 (2007) ("[C]ertainty of punishment is empirically known to be a far

better deterrent than its severity.").  Typical of the findings on general deterrence

are those of the Institute of Criminology at Cambridge University.  *See* Andrew von

Hirsch *et al*., *Criminal Deterrence and Sentence Severity:  An Analysis of Recent

Research* (1999).[11]

The report, commission by the British Home Office, examined penalties in

the United States as well as several European countries.  *Id*. at 1.  It examined the

effects of changes to both the certainty and severity of punishment.  *Id*.  While

significant correlations were found between the certainty of punishment and crime

rates, the "correlations between sentence severity and crime rates … were not

---

[11] Available at
https://web.archive.org/web/20180506155926/https://www.albertalawreview.com/index.php/ALR/article/download/1415/1404.

sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentence is capable of enhancing deterrent effects." *Id*. at 1.

The sentence requested by the defense also promotes respect for the law: Mr. Correia will have a felony conviction on his record. It will affect every government or private application he seeks, every loan he applies for, every government benefit he tries to obtain. Counsel refers the Court to Mr. Correia's allocution statement, which eloquently speaks to this.

## IV. The Need to Avoid Unwarranted Disparities in Sentencing

Section 3553(a) directs the sentencing judge to consider the need to avoid unwarranted disparity at sentencing. This factor initially seems to encourage deference to the Guideline range, because the Guidelines were developed to eliminate unwarranted sentencing disparities in federal courts. In practice, however, the focus of the Guidelines has gradually moved beyond elimination of *unwarranted* sentencing disparities towards the goal of eliminating *all* disparities. This goal is not only impractical but also undesirable.

There are inherent disparities in every criminal prosecution because the criminal justice system is filled with discretion commencing at the time of arrest. Disparity may arise initially based on judgment made by the officer at the scene of the crime regarding the amount of incriminating evidence, the reputation of the suspect, or the perceived seriousness of the crime. Those initial judgments may determine whether the suspect is arrested in the first place. Next, assuming an arrest has been made, the officer must then decide whether to take the case to prosecutors in federal or state court. Sometimes the options may include different state courts, different magistrate judges, or even different counties within a state.

Once the venue has been determined, the prosecutors begin to exercise discretion over the case. At this point, the prosecutor's perception of the seriousness of the crime may play a role in determining whether the suspect is indicted, as will the available evidence, the defendant's reputation, the defendant's criminal history, and the defendant's ability to assist the investigation of other criminal activity. Further, assuming the prosecutor decides to seek an indictment, the prosecutor has discretion regarding the specific crimes to be charged and presented to the Grand Jury. In addition, the prosecutor has the discretion to accept a variety of different plea agreements during the plea negotiation process.

None of these examples of discretion and disparity are necessarily undesirable. All criminal justice systems are created by humans, run by humans, and subject to human error and discretion at every level. Obviously, it is important to eliminate abusive and unreasonable exercises of discretion to the fullest extent possible. Exercises of discretion that lack guided judgment lead to the *unwarranted* disparities that the Guidelines were originally intended to extinguish. Removing human discretion entirely, however, removes humanity from the process and leaves only a soulless algorithm. The system works best when people who are informed and well-trained exercise appropriate discretion at all levels of the process. Humanity and the well-reasoned exercise of discretion lead to *warranted* sentencing disparities that are not only desirable, but also necessary to achieve the goals of a just society. The current advisory Guideline system, which permits judges to exercise discretion while still providing guidance, is sound because it allows for human determinations that cannot be made with a calculator or strict adherence to

formulae.[12]

It is foolhardy to think that a sentencing guideline regime that carefully cabins offense into little boxes of discrete and small ranges of sentencing is sufficient to achieve uniformity of treatment, or to think that uniformity of treatment is necessarily desirable.

The Guidelines define "similarly situated" only with reference to the particular guideline categories. If a defendant had an offense level of 14 and a criminal history of I, the Guidelines assumed that you were similarly situated to other 14's and I's. But in this case – and perhaps many others – that is a false assumption. Similarly situated with respect to the Guidelines categories does not necessarily mean similarly situated with respect to the defendant's actual role in the criminal endeavor or his real culpability. The individual supplying the drugs, for example, could have been a first offender, with a criminal history I, not because he had been crime-free all of his life but because he did not "do" street drug deals and thus rarely encountered government agents. And the reverse, an offender with a high criminal history score, could have been caught in this drug sweep even when

---

[12] One commentator, for example, has noted the following "troublesome" contradiction inherent in 18 U.S.C. § 3553:

> The statute directs sentencing courts to consider "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; … [and] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct…." Judges have a statutory mandate to continue to individualize sentences … balanced against a directive that those individualized sentences should not vary too much from those of similarly situated defendants. One way to view that tension is to ask what is unwarranted, as opposed to warranted, disparity among defendants. Ultimately, we should determine what matters when we ask whether one bank robber should receive the same sentence as another bank robber.

Ian Weinstein, *The Discontinuous Tradition of Sentencing Discretion: Koon's Failure to Recognize the Reshaping of Judicial Discretion Under the Guidelines*, 79 B.U. L. Rev. 493, 509-10 (1999).

14

his drug dealing was episodic, when he had tried to change the direction of his life. The numbers – the Guideline computation – could mask real difference between offenders, in effect, a "false uniformity."  Sandra Guerra Thompson, <u>The Booker Project:  The Future of Federal Sentencing</u>, 43 Hous. L. Rev. 269, 275 n.25 (2006); Michael M. O'Hear, The Myth of Uniformity, 17 Fed. Sent'g Rep. 249 (2005).  It is especially important, now that the Guidelines are advisory, that judges are charged with looking beyond the Guidelines categories and that they know what their colleagues have done in comparable cases.  The new discretion will be influenced, as it should be, by the precedents of the court:  a true common law of sentencing.

As an aid to the Court, the defendant below lists the sentencing results in the seven co-defendants who have been sentenced in this case:[13]

| | |
|---|---|
| Kenny Romero | **63 months**.  Counts 1, 2, 15, 20, 21, 23, and 28 (consecutive to SR violation of 24 months on 19-cr-10330-WGY).<br>Ct 1:  possession with intent to distribute cocaine<br>Ct 2 overt acts:<br>      o:  distribution of marijuana<br>      p:  distribution of cocaine base<br>      r:  possession of cocaine<br>      s:  distribution of cocaine<br>Ct 15: distribution of and possession with intent to distribute cocaine base<br>Ct 20:  distribution of and possession with intent to distribute cocaine<br>Ct 21:  felon in possession of a firearm and ammunition<br>Ct 23:  felon in possession of a firearm<br>Ct 28:  felon in possession of a firearm |
| Keiarri Dyette | **42 months.**  Counts 2, 9, and 16.<br>Ct 2 overt acts:<br>      m:  distribution of marijuana<br>      n:  attempted murder<br>Ct 9:  dealing in firearms without a license<br>Ct 16:  conspiracy to distribute and to possess with intent |

---

[13] The co-defendants' sentencing numbers, while informative is still of limited assistance, as Correia does not know the co-defendants' CHC, nor whether they were found responsible for all the overt acts alleged against them in the indictment.

to distribute cocaine base

Paulo Santos      **120 months**. Counts 2, 4, 5, and 6.
Ct 2 overt acts:
     f:  unarmed robbery
     h:  poss over 500 g cocaine, marijuana, a firearm, ammunition
Ct 4:  possession with intent to distribute more than 500 grams but less that 2 kilograms of cocaine
Ct 5:  felon in possession of a firearm and ammunition
Ct 6:  possession of a firearm in furtherance of a drug trafficking offense

Michael Lopes      **57 months**. Superseding Information charging Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, Cocaine Base, and Methamphetamine

Michael Nguyen      **70 months.  Count 2 and 40.**
Ct 2 overt acts:
     aa:  armed robbery and home invasion
Ct 40: conspiracy to interfere with commerce by threats or violence

Daronde Bethea      **250 months.  Counts 2, 40 and 41.**
Ct 2 overt acts:
     c:  armed robbery and home invasion
     z:  attempted murder
     aa:  armed robbery and home invasion
Ct 40: conspiracy to interfere with commerce by threats or violence
Ct. 41:  felon in possession of a firearm and ammunition.

Brendon Amado      **70 months.  Count 40.**  Conspiracy to interfere with commerce by threats or violence.

## V.    This Court Should Exercise Its Discretion and Apply a Downward Departure

Departures are sentences outside of the guideline range authorized by specific policy statements in the Guidelines Manual.

**A. Downward Departure for Youthful Individual**

Effective November 1, 2024, §5H1.1 was amended so that the age, and specifically youthfulness of an offender, may be taken into account in granting a departure. Correia requests that this Court give a downward departure to account for the recent change in the Guidelines and his youth and immaturity at the time of the offenses.

The amendment changed the first sentence in §5H1.1 to delete "(including youth)" and "if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." Now the first sentence in §5H1.1 provides solely that "[a]ge may be relevant in determining whether a departure is warranted." The amendment also added language specifically providing for a downward departure for cases in which the defendant was youthful at the time of the offense or prior offenses, and set forth considerations for the court relating to youthful individuals:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

17

USSG §5H1.1, p.s.

The Sentencing Commission has indicated the reason for the amendment is the evolving science and data surrounding youthful individuals:

> The amendment revises the first sentence in §5H1.1 to provide more broadly that "[a]ge may be relevant in determining whether a departure is warranted." It also adds language specifically providing that a downward departure may be warranted in cases in which the defendant was youthful at the time of the instant offense or any prior offenses. In line with the Commission's statutory duty to establish sentencing policies that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process," 28 U.S.C. § 991(b)(1)(C), this amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability. The amendment also reflects expert testimony to the Commission indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime.

https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202405_Amendments.pdf

"[A] child does not go to bed on the eve of her eighteenth birthday and awaken characterized by a lessened 'transient rashness, proclivity for risk, and inability to assess consequences.'  In recognition of this indisputable fact, society does not treat the transition from childhood to adulthood as a binary act accomplished at age eighteen; becoming an adult is much more fluid, with development continuing long after a child's eighteenth birthday." *Commonwealth v. Mattis*, 493 Mass. 216, 250-251, 224 N.E.3d 410, 439 (2024) (Wendlandt, J. concurring), *quoting Miller v. Alabama*, 567 U.S. 460, 472 (2012).  Recent studies on brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished.

The Supreme Court has recognized that "children are constitutionally different

from adults in their level of culpability."[14] That is, "juveniles have diminished

culpability."[15] The Court's decisions in this series increasingly rest "not only on

common sense—on what any parent knows"—but on "science and social science"

including an "ever-growing body of research in developmental psychology and

neuroscience."[16] The research shows that "[c]ompared with adults, juveniles are less

able to restrain their impulses and exercise self-control; less capable of considering

alternative courses of action and avoiding unduly risky behaviors; and less oriented

to the future and thus less attentive to the consequences of their often-impulsive

actions."[17] It also "demonstrate[s] that 'juveniles are more vulnerable or susceptible

to negative influences and outside pressures, including peer pressure,' while at the

same time they lack the freedom and autonomy that adults possess to escape such

pressures."[18] And recent "neuroscience research suggests a possible physiological

basis for these recognized developmental characteristics of adolescence."[19] As the

Court noted: "It is increasingly clear that adolescent brains are not yet fully mature

in regions and systems related to higher-order executive functions such as impulse

---

[14] *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016) (holding that the Court announced a substantive rule of constitutional law in *Miller v. Alabama*, 567 U.S. 460, 463 (2012) (holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'")). *See also Graham v. Florida*, 560 U.S. 48, 82 (2010) (holding that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed").
[15] *Miller*, 567 U.S. at 471.
[16] *Id.* at 471-472 & n.5.
[17] Brief for the American Psychological Association, American Psychiatric Association and National Association of Social Workers as *Amici Curiae* in Support of Petitioners at 3-4, *Miller*, 567 U.S. 460 (Nos. 10-9646, 10-9647).
[18] *Id.* at 4.
[19] Id.

control, planning ahead, and risk avoidance."[20]

Eric Correia was 21 years old at the time of the offenses involving Victim 14 (attempted murder) and Victim 6 (robbery) at issue in this case.[21]  The term  "late adolescent" is often used interchangeably with "emerging adult."  The decision in *Commonwealth v. Mattis*, 493 Mass. 216 (2024) categorized emerging adults as 18-20-year-olds, however that term can also be used to refer to a broader age group ranging from 16-25 years old. *Id.* at 217 n.1.

Beginning in 2005 with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court has explicitly acknowledged that youth are not the same as adults and therefore should not be punished in the same way as adults. The Court found that there are universal differences in young people, namely their "lack of maturity and underdeveloped sense of responsibility," vulnerability or susceptibility to "negative influences and outside pressures, including peer pressure," and their character is "not as well formed as that of an adult." *Id.* at 569, 570  (holding unconstitutional the death penalty for children). The Supreme Court then reaffirmed that given the characteristics of adolescence, youth under the age of 18 are "less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010) (holding unconstitutional life without the possibility of parole for children convicted of non-homicide offenses).  These critical differences between youth and adults are supported both by science and common sense.  *Miller v. Alabama*, 567 U.S. 460, 471 (2012).

Adolescence is a distinct period in which a young person may resemble an

---

[20] *Miller,* 567 U.S. at 472 n.5.
[21] He was 19 years old at the time of the attempted murder of C.V.; he was 21 years old at the time of the attempted murder of Victim No. 14 and the robbery of Victim No. 6; he was 24 years old at the time of the marijuana offense.

adult, but has not yet completed their neurological, biological, or psychological development. Though 18 is often the age of legal adulthood, science and experience demonstrate that individuals in their late teens and early 20s are still adolescents. "Advancements in scientific research have confirmed what many know well through experience: the brains of emerging adult are not fully mature." *Mattis*, 493 Mass. at 225. Where immaturity impacts a young person's behavior and decision-making, and ongoing development is linked to the ability to change, adolescence is essential to determining an appropriate sentence. *Id.* at 234.

The science of emerging adult brains has shown the following: "emerging adults (1) have a lack of impulse control similar to sixteen and seventeen year olds in emotionally arousing situations, (2) are more prone to risk taking in pursuit of rewards than those under eighteen years and those over twenty-one years, (3) are more susceptible to peer influence than individuals over twenty-one years, and (4) have a greater capacity for change than older individuals due to the plasticity of their brains. The driving forces behind these behavioral differences are the anatomical and physiological differences between the brains of emerging and older adults. *See* Steinberg, A Social Neuroscience Perspective on Adolescent Risk-Taking, 28 Developmental Rev. 78, 82-84, 85-89 (2008). These structural and functional differences make emerging adults, like juveniles, 'particularly vulnerable to risk-taking that can lead to poor outcomes.'" *Mattis*, 493 Mass. at 225, 224 N.E.3d at 421. *See also*, Center for Law, Brain & Behavior at Massachusetts General Hospital (2022), *White Paper on the Science of Late Adolescence:  A Guide for Judges, Attorneys, and Policy Makers* (Jan. 27, 2022), available at

https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/; U.S. Sentencing Commission, 2024 Youthful Individuals Data Briefing (Feb. 12, 2024),

available at https://www.ussc.gov/education/videos/2024-youthful-individuals-data-briefing.

Eric's brain was predisposed to reacting impulsively, but it is important to note that impulsivity is not part of his character; it is a fact of all late adolescent brains and one that he has naturally begun to mature out of.  It is universally accepted that people change from late adolescence into and through adulthood, a fact no less true for Eric.  Because adolescence is universal and temporary, Eric has a particularly high capacity and likelihood for rehabilitation.

Importantly, Correia is not using age and brain development to diminish the seriousness of his offense; he is not asking the Court for his offense to be excused. Adolescence is not an excuse.  Adolescence is an explanation and offers context for his offense, and is presented to be considered in mitigation of the length of the sentence to be imposed as a result of his criminal conduct which he has accepted responsibility for without any excuses.  As the Supreme Court and statutory authorities clarify, mitigation evidence is not presented or admitted as an excuse for engaging in  criminal conduct, but rather as mitigation in the length of sentence or punishment to be imposed as a result of that criminal conduct.  *See, Lockett v. Ohio*, 438 U.S. 586 (1978I), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, 18 U.S.C. § 3661 (no limit is placed on the information concerning the background, character, and conduct of a person convicted of an offense which a sentencing court may receive and consider for the purpose of imposing an appropriate sentence).

Furthermore, peer pressure played a part in Eric's participation in the offense.  Research shows that typically, adolescents are vulnerable to peer pressure, and that adolescents are therefore more likely to take risks when in the presence of peers.  In fact, risk-taking in the presence of peers has been identified as "one of the

hallmarks of adolescent risk-taking."  Albert Chein, et al., *Peers Increase Adolescent Risk Taking by Enhancing Activity in the Brain's Reward Circuitry*, 14:2 Developmental Sci. F1, F1 (2011).  Increased risk-taking in the presence of peers is also associated with greater neural activity in the areas of the brain associated with reward processing.  *Id*.  In addition, studies show that youth may gravitate toward the protection a gang offers in areas where gangs are prevalent. Emma Alleyne & Jane Wood, *Gang Involvement: Psychological and Behavioral Characteristics of Gang Members Peripheral Youth, and Nongang Youth*, 36 AGGRESSIVE BEHAV. 423, 424 (2010).[22]  In the context of this case, engaging in violent acts gave a gang member "status."  In other words, rewarding the gang member for committing a violent act.  At the same time, the pressure to conform to the codes of the gang would have been great as well, given the consequences of a perceived violation of such codes. *See id*. ("gangs [] exert[] two types of social power that attract youth: coercive power - the threat or actual use of force and violence; and the power to pay, buy, impress and to delegate status and rank to its members.").  *Id*.

"[A]s any parent knows and as the scientific and sociological studies … tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions." *Roper*, 543 U.S. at 569 (quotation marks and citation omitted).  In determining sentence, the Court should consider the effects of Correia's age at the

---

[22] Available at
https://www.researchgate.net/publication/45696008_Gang_Involvement_Psychological_and_Behavioral_Characteristics_of_Gang_Members_Peripheral_Youth_and_Nongang_Youth

time he first became connected with the gang and at the time he committed the offenses, and should sentence below the Guidelines range.

### B.  Eric Correia's Diminished Capacity

Despite the Sentencing Guideline's apparent disfavor toward at least certain mental and emotional conditions, courts are taking such factors into account, and departing downward for mental and emotional conditions—at least in part. According to Sentencing Commission data, in fiscal year 2014, there were 620 instances of downward departures or variances citing USSG § 5H1.3 or § 5K2.13 that did not involve a government motion for substantial assistance. (*See Commission Datafiles*, U.S. Sent'g Commission, http://tinyurl.com/q7s6z2a (follow "Fiscal Year 2014" hyperlink under "Individual Offender Datafiles").) Thus, departures or variances for mental or emotional conditions, while far from frequent, are not unheard of and most often involve drug, economic, or firearms offenses.  The Guidelines allow for a downward departure due to the diminished capacity of the defendant.

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
>
> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

U.S.S.G. § 5K2.13 (Policy Statement).

The application note for this section illustrates that the departure is intended to address both cognitive and volitional impairments, stating that a "significantly reduced mental capacity" means "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, commentary, n.1. The defendant requests that he be given a departure under § 5K2.13 on the basis of his diminished capacity, based on his diagnosed mental health disorders.

### C. Eric Correia's Extraordinary Mental and Emotional Condition

Should this Court disagree with defendant and hold that it cannot grant a departure under § 5K2.13, Correia submits that § 5H1.3 allows the Court to grant a departure on the basis of his mental or emotional condition. Ordinarily § 5H1.3 would not be an available departure for a defendant, because § 5K2.13 encompasses the issue of a defendant's mental condition. However, in an extraordinary case, a mental or emotional condition may warrant a lighter sentence even if it does not fit the express exception in § 5K2.13, the diminished capacity departure. U.S.S.G. § 5H1.3 (policy statement) provides:

> Mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).

"*Both* U.S.S.G. §§ 5K2.0 and 5K2.13 satisfy that requirement." *United States v. Hines*, 26 F.3d 1469, 1478 n.6 (9th Cir. 1994) (emphasis in original), cited in *United States v. Carvell*, 74 F.3d 8, 12 n.5 (1st Cir. 1996) (district court had authority to depart based on defendant's mental health condition under § 5K2.11, the "lesser harms" provision). A sentencing court may reduce or eliminate an incarcerative

sentence under the federal sentencing guidelines upon a finding "that there exists …
[a] mitigating circumstance of a kind, or to a degree, not adequately taken into
consideration by the Sentencing Commission in formulating the guidelines that
should result in a sentence different from that described."  18 U.S.C. § 3553(b);
U.S.S.G. § 5K2.0.  Following the decision of the First Circuit in *United States v.
Rivera*, 994 F.2d 942, 947 (1st Cir. 1993), the trial court has broad authority to
depart from the guideline range where "the given circumstances, as seen from the
district court's unique vantage point, are … unusual … or not ordinary…." *Id*. at
951.  *See also Koon v. United States*, 518 U.S. 81, 92-98, 116 S. Ct. 2035, 2044-2046,
135 L.Ed.2d 392 (1996).

Sections 5K2.0 and 5K2.13 set forth two distinct bases for downward
departure where a defendant suffers from an impaired mental or emotional
condition.  As such, this Court has authority to depart downward under § 5H1.3 and
§ 5K2.0 based on Mr. Correia's extraordinary mental and emotional condition, even
though he may not satisfy the requirements of § 5K2.13.

Section 5H1.3 allows the court to consider a defendant's mental and
emotional conditions, if it determines it to be an extraordinary case.  §5K2.0, in turn,
authorizes a district court to depart from the applicable guideline range if the court
finds "that there exists an aggravating or mitigating circumstance of a kind, or to a
degree, not adequately taken into consideration by the Sentencing Commission in
formulating the guidelines that should result in a sentence different from that
described.

The decision as to what extraordinary circumstances render mental and
emotional conditions relevant under the Guidelines is fact-bound.  *United States v.
Shore*, 143 F.Supp.2d 74, 79 (D. Mass. 2001).  Eric Correia has been diagnosed with

26

adjustment disorder with mixed anxiety and depressed mood, with general anxiety disorder, post-traumatic stress disorder ("PTSD") and major depression disorder. PSR ¶ 69. He witnessed the suicide of his brother, who had been committed to a mental health facility and diagnosed with schizophrenia. His sister, Carla, believes that their mother has undiagnosed bipolar disorder. His father passed away unexpectedly in late 2021 from organ failure. He saw a friend killed after being hit by a car in Cape Verde, and has lost over ten friends to gun violence and drugs. PSR ¶¶ 58-59. Although he has received some mental health treatment, he has not taken medication, aside from an anti-anxiety drug (hydroxyzine) and melatonin. PSR ¶ 69.

Mr. Correia's resultant mental and emotional condition is outside the norm, and this Court should take it into consideration in its sentencing decision.

## VI.     This Court Should Exercise Its Discretion and Apply a Downward Variance

If this Court finds that Mr. Correia's background does not rise to the level of a departure, he requests a downward variance. Sentencing courts have discretion to vary based on policy disagreements with the guidelines. The Supreme Court first recognized district court's ability to vary due to a disagreement with the guidelines in *Kimbrough*, which "makes manifest that sentencing courts possess sufficient discretion under section 3553(a) to consider requests for variant sentences premised on disagreements with the manner in which the sentencing guidelines operate." *United States v. Rodriguez*, 527 F.3d 221, 231 (1st Cir. 2008) (reversing, in light of *Kimbrough*, prior precedent forbidding district courts from constructing variant sentences to take account of disparities attributable to the fast-track program). As the Supreme Court has emphasized, the point of *Kimbrough* is to recognize "district

courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States*, 555 U.S. 261, 264 (2009) (emphasis in original). *See also United States v Martin*, 520 F.3d 87, 93 (1ˢᵗ Cir. 2008) ("policy statements normally are not decisive as to what may constitute a permissible ground for a variant sentence in a given case…. A district court therefore may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence.") (citations omitted)

Mr. Correia requests that this Court apply a downward variance based his background. A sentence of 120 months will leave him with the hope of rehabilitation in the future. "Rehabilitation is also a goal of punishment. 18 U.S.C. § 3553(a)(2)(D). That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment." *United States v. Carvajal*, 2005 U.S. Dist. LEXIS 3076 at *15-16 (S.D.N.Y. Feb. 22, 2005).

The guidelines prohibits the Court from considering the conditions under which Eric Correia grew up, just as it excludes any meaningful consideration of the lives of the many African American and Latino defendants that appear before federal judges for sentencing. And when his background is viewed as an "excuse" for the commission of crime, he is denied the individual assessment of his background that Congress said all defendants are entitled to at the time of sentencing. *See*, USSG § 5H1.12 (forbidding consideration of lack of guidance as a youth and similar

28

circumstances indicating a disadvantaged upbringing) and compare to 18 U.S.C. §
3661.

Defense counsel is aware, however that this view has been resoundingly
rejected by most, but not all, sentencing judges and on appellate review.  *Cf. United
States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011).  Recognizing this
phenomenon, the court in *Bannister* imposed sentences at variance with the
guidelines, since the observed factors were prohibited from consideration in the
numerical calculation under the guidelines.  Notwithstanding the sentencing
guidelines' discouragement of departure based on a defendant's childhood history,
(U.S.S.G. § 5H1.12 (policy statement)), a variance is warranted in this case.

A youth spent witnessing instances of crime, including 10 of his friends dying
either from overdoses or violence, places his experience in the extraordinary
category.  To say otherwise would make the perverse statement that such abuse is
normal.  It is reasonable to lower Correia's sentence based upon his youthful
exposure to a violent and traumatic environment.

## VII.    The Aggregation of the Above-Referenced Factors

A downward departure or variance may be granted based on an aggregation
of factors each of which may individually be insufficient to justify a departure or
variance.  In the case of Mr. Correia, the cumulative factors are his tragic personal
history and loss of loved ones (*see United States v. Lopez*, 938 F.2d 1293, 1297-99
(D.C. Cir. 1991) (district court to consider departure because defendant exposed to
domestic violence, the murder of his mother by his step-father, his need to leave
town because of threats, and his growing up in disadvantaged neighborhoods)); and
his lack of personal guidance as a youth (*see United States v. Floyd*, 945 F.2d 1096
(9th Cir. 1991) (fifty percent downward departure from guideline range appropriate

29

because of defendant's abandonment by his parents and lack of guidance as a youth)), as well as his mental health and emotional condition. These factors individually are sufficient grounds for a downward departure or variance However, should the Court disagree with that analysis, defendant is asking that they be aggregated and together form the basis for departure or variance.

The guidelines explicitly acknowledge that a combination or aggregation of factors could distinguish a case from the "heartland." This possibility has been addressed in the comments to the guidelines, and has been supported by the Sixth Circuit sitting *en banc* in *United States v. Coleman*, 188 F.3d 354 (6th Cir. 1999). The comment to U.S.S.G. § 5K2.0 recognizes:

> The possibility of an extraordinary case that, because of a combination of such characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. However, the Commission believes that such cases will be extremely rare.

U.S.S.G. § 5K2.0, Commentary.

In *United States v. Rivera*, 994 F.2d 942, 947 (1993), the First Circuit noted that the Sentencing Commission,

> has explicitly stated that (with a few exceptions) it did not "adequately" take unusual cases "into consideration." Of course, deciding whether a case is "unusual" will sometimes prove a difficult matter (in respect to which particular facts, general experience, the Guidelines themselves, related statutes, and the general objectives of sentencing al may be relevant). But, once the court ... has properly determined that a case is, indeed, "unusual," the case becomes a candidate for departure....

This Court should similarly consider whether Mr. Correia's case has sufficient extraordinary factors to take it out of the heartland of similar cases. The facts and circumstances of this case provide solid reasons for the Court to impose such a sentence. When applying these factors to Eric Correia's case, it becomes clear

that a sentence of 120 months' imprisonment, followed by 3 years of supervised release is sufficient to achieve each of the sentencing goals outlines in § 3553(a), and is more than sufficient to reflect the seriousness of the offense.  Mr. Correia acknowledges that this is a significant variance from the guidelines sentence, but what he is requesting – 120 months – is by no measure a trivial restriction of his liberty.  A sentence that takes 10 years from his life will certainly achieve the goals of sentencing.  Anything greater would not constitute "just punishment" for Mr. Correia.

### CONCLUSION

The defendant, Eric Correia, respectfully moves that this Court impose a sentence of 120 months, followed by 3 years of supervised release and no fine due to his present lack of resources.  Undersigned counsel submits that, considering the factors under 18 U.S.C. § 3553(a),  this sentence is "sufficient but not greater than necessary," for Mr. Correia.

Respectfully submitted,
ERIC CORREIA
By his attorney

/s/ MARK W. SHEA                              Dated: November 9, 2024
Mark W. Shea
Shea and LaRocque, LLP
88 Broad Street, Suite 101
Boston MA  02110
telephone:  617.577.8722
e-mail:  markwshea@shearock.com

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) will be sent to those indicated as non-registered participants on November 9, 2024.

/s/ Mark W. Shea
MARK W. SHEA